IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-00562-RMR-KAS

GEOSTABILIZATION INTERNATIONAL LLC, a Colorado limited liability company,

      Plaintiff/Counterclaim Defendant,

v.

JUSTIN ANDERSON, an individual,

      Defendant/Counterclaim Plaintiff.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

      This matter is before the Court on Defendant's **Motion to Dismiss Plaintiff's First Amended Complaint or, in the Alternative, Compel Mandatory Alternative Dispute Resolution** [#23] ("Defendant's Motion") and on Plaintiff's **Motion to Dismiss Defendant's Counterclaims** [#43] ("Plaintiff's Motion"). The parties filed Responses [#42, #53] in opposition to each other's Motion [#23, #43], and Replies [#49, #58] in support of their own. The Motions [#23, #43] have been referred to the undersigned for a Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D.C.COLO.LCivR 72.1(c)(3). *See* [#24, #44]. The Court has reviewed the briefs, the case file, and the applicable law. For the reasons stated below, the Court **RECOMMENDS** that both Motions [#23, #43] be **GRANTED in part** and **DENIED in part**.

## I. Background

**A.    Plaintiff's Allegations**

Plaintiff Geostabilization International, LLC ("Plaintiff" or "GSI") is a geohazard mitigation firm which "specializes in emergency landslide repairs, rockfall mitigation, and grouting using design/build contracting." *Am. Compl.* [#19] ¶ 7.[1] On January 5, 2016, GSI and Defendant Justin Anderson ("Defendant" or "Anderson") executed an Employment Agreement. *Id.* ¶ 8. Defendant was hired to serve as GSI's Project Development Engineer in the Midwest region and its railroad market sector. *Id.* ¶ 9. The Employment Agreement contained a non-compete provision prohibiting Defendant from owning, managing, operating, controlling, or otherwise being engaged in any activity or business similar to, or in competition with, GSI, that extended for a two-year period following the end of Defendant's employment with GSI. *Id.* ¶¶ 10-11. The Employment Agreement also contained a non-solicitation provision prohibiting Defendant from employing or hiring a GSI employee within twelve months of that employee leaving GSI. *Id.* ¶ 12. Additionally, the Employment Agreement contained a covenant not to use GSI's confidential or proprietary information for Defendant's own benefit or for the benefit of any person other than GSI. *Id.* ¶ 13. Plaintiff alleges that, while Defendant was at the company, he was

---

[1] The well-pled factual allegations from the parties' operative pleadings, i.e. Plaintiff's Amended Complaint [#19] and Defendant's Counterclaims [#22], are accepted as true for purposes of resolving the opposing party's motion to dismiss. *See, e.g.*, *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135-36 (10th Cir. 2014) (stating that on a Rule 12(b)(6) motion the court must accept all well-pled factual allegations in the complaint as true); *see also Jones v. Addictive Behav. Change Health Grp., LLC*, 364 F. Supp. 3d 1257, 1265 (D. Kan. 2019) ("In determining whether a counterclaim should be dismissed pursuant to Rule 12(b)(6), the court applies the same standards as applied in considering a motion to dismiss a complaint for failure to state a claim for relief.").

privy to its project bidding process and strategy information, which it took steps to protect from public disclosure. *Id.* ¶ 14.

On February 3, 2021, Defendant "submitted a notice to GSI executives that he would be 'retiring' from the business to spend more time with his family." *Id.* ¶ 15. He told them he planned to open his own small engineering consulting firm and to invest in local landscaping and fencing construction businesses "to give him and his father 'something to do together' during their retirement." *Id.* ¶ 15. However, according to Plaintiff, these representations were false; Defendant had incorporated two entities in Kentucky: Anderson Professional Services, LLC, doing business as APS Geo ("APS Geo") and Guardian Fence and Construction, LLC, doing business as Geospecialties ("Geospecialties"). *Id.* ¶ 16. APS Geo and Geospecialties were not small consulting firms but, rather, "large-scale businesses formed to directly compete with GSI" through recruitment of "its former employees and [use of] its proprietary information to outbid the company on projects" and "structured to disguise their true intentions and activities." *Id.* Shortly after learning these facts, GSI filed suit against Anderson in *Geostabilization International LLC v. Anderson*, No. 21-cv-01788-CMA-MEH (D. Colo. 2021), for breach of the Employment Agreement's non-competition and non-solicitation provisions. *Id.* ¶ 17.

On August 18, 2021, the parties executed a confidential settlement agreement (the "CSA") intended to resolve the parties' disputes and "to clarify [Defendant's] obligations under the Employment Agreement going forward." *Id.* ¶ 18. The CSA also extended the restrictive covenants through August 18, 2023. *Id.* In part, the CSA clarified:

> a.     Anderson may perform purely engineering design work for any client, provided that Anderson does not directly or indirectly steer or direct construction work or design-build construction work away from GSI.

b. For the avoidance of doubt, Anderson may put a project to public bid where Anderson is engaged by the client for a new project and asked to create a bid set for public bid, so long as Anderson does not steer the work away from GSI directly or indirectly.

c. In a situation where GSI already has a design/build proposal in to a client for a specific project, Anderson may not create a "bid set" that mirrors the work GSI has done, and then puts GSI's design/build proposal which already exists out for public bid. Anderson agrees to make a good faith effort to ascertain whether GSI already has a design/build proposal in to a client for a specific project by inquiring with said client.

d. Anderson may not use any GSI property in performing his engineering design work.

e. If a potential customer reaches out to Anderson attempting to connect to GSI, Anderson must pass that along to GSI.

*See CSA* [#22-6] at 4 ¶ 14.[2] Defendant also represented that, but for a bridge project in

Carroll County, Kentucky, he "did not use or access any GSI data, computer files or other

documents . . . after his tenure with GSI or during his tenure with GSI for the purpose of

disadvantaging GSI with respect to its competitors." *Id.* at 2 ¶ 10.

Plaintiff alleges that these representations were also false, and that Defendant

"has only continued his campaign to compete with GSI since his departure by hiring GSI

employees and using its proprietary information to outbid the company on projects[.]" *Am.*

*Compl.* [#19] ¶ 21. Defendant allegedly hired former GSI employees through APS Geo,

which markets itself as a planning, development, and design firm, "to make it appear as

if the former GSI employees were not in breach of their respective employment

---

[2] Plaintiff quotes this language in the Amended Complaint, *see* [#19] ¶ 19, but the Court may consider the CSA [#22-6] itself, as well as the Employment Agreement [#22-1] (both of which are attached to Defendant's Counterclaims [#22]), because the Court may consider outside documents that are both central to the litigant's claims and to which the litigant refers in its pleading. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997). The Court notes that, where a brief or other document's internal page numbering differs from the numbering on the Court's CM/ECF docketing system, the Court cites the latter.

agreements," but, in reality, those former employees "performed work on behalf of, and in coordination with, Geospecialties, Anderson's other company that performs identical work to GSI including, but not limited to, soil nailing, geohazard repairs, grouting, shotcrete, grade and drainage, and rockfall hazards." *Id.* ¶¶ 22-24.

For example, a project development engineer named Matt Williams ("Williams") terminated his employment with GSI in June 2022 and was almost immediately hired by APS Geo, even though the CSA prohibited him from hiring former GSI employees through August 18, 2023, and Mr. Williams' own employment agreement prohibited him from working for a competing business through August 2024. *Id.* ¶ 25. Defendant "admitted in conversations with GSI that this was a breach of the [CSA]." *Id.* GSI's former director of rockfall services, Marty Woodard ("Woodard"), was subject to a similar non-compete provision, but in August 2023, Defendant hired him as a senior engineer and geologist for APS Geo and Geospecialties. *Id.* ¶¶ 26-27. Finally, GSI's former senior superintendent Casey Prine ("Mr. Prine") was subject to similar non-compete restrictions, but Defendant hired Mr. Prine during the restricted period to perform almost identical work for Geospecialties. *Id.* ¶¶ 28-31.

Plaintiff believes that Defendant "may have hired or may be in the process of hiring yet unidentified individuals who have similar obligations to GSI to perform work" in violation of their non-compete agreements. *Id.* ¶ 32. Additionally, it believes that Defendant has used trade secret and proprietary bidding-related information to compete with it on projects "including, but not limited to, KY 197, US 421, Edgemont Road Slip, Upper Dry Fork, Little Doe Run, and Philpott Dam." *Id.* ¶ 33.

As a result of these allegations, Plaintiff asserts five claims: (1) Claim One: breach of contract, *id.* ¶¶ 34-41; (2) Claim Two: tortious interference with contract, *id.* ¶¶ 42-46; (3) Claim Three: civil conspiracy, *id.* ¶¶ 47-52; (4) Claim Four: theft of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, *id.* ¶¶ 53-59; and (5) Claim Five: theft of trade secrets in violation of the Colorado Uniform Trade Secrets Act ("CUTSA"), Colo. Rev. Stat. § 7-74-101, *et seq.*, *id.* ¶¶ 60-65. As relief, Plaintiff seeks damages. *Id.* at 12. Defendant's Motion [#23] seeks dismissal of Claims Two, Three, and Five pursuant to Fed. R. Civ. P. 12(b)(6); entry of summary judgment in his favor on Claims One and Four pursuant to Fed. R. Civ. P. 56; or, in the alternative, an order compelling the parties to engage in alternative dispute resolution ("ADR").

**B.      Defendant's Allegations**

Defendant executed an Employment Agreement [#22-1] with GSI on January 5, 2016. *Counterclaims* [#22] ¶ 6. GSI drafted the Employment Agreement [#22-1], which contains a Kentucky choice-of-law provision. *Id.* ¶ 11 (citing *Employment Agreement* [#22-1] at 11 ¶ 14); *see also* [#22-1] ¶ 16 (Colorado choice-of-venue provision). Defendant decided to resign from GSI in early 2021 and expressed his intention to open a small engineering consulting firm as well as a landscape fencing and construction business, with approval from GSI's then-CEO, Colby Barrett ("Mr. Barrett"). *Counterclaims* [#22] ¶ 15. In a recorded call, Defendant informed Mr. Barrett of his intention to start APS Geo and Geospecialties, and Mr. Barrett agreed that those companies "would not violate [Defendant] Anderson's restrictive covenants, and further agreed that these pursuits were a carve-out to those obligations." *Id.* ¶ 19.

6

GSI allegedly offered to use APS Geo's services and made at least one payment for Defendant's consulting services in 2021. *Id.* ¶ 20. However, Mr. Barrett "began exploring ways to keep [Defendant] Anderson involved in GSI's ongoing business," including presenting Defendant with a Consulting Agreement. *Id.* ¶¶ 21-22. Defendant declined the invitation but he did some limited consulting for GSI at the time, and GSI issued him a computer, access to his old email address, and "other information necessary to pass along leads to GSI." *Id.* ¶¶ 23-24. Four months after Defendant's departure, GSI sued him for allegedly violating his non-compete agreement. *Id.* ¶ 26. On August 18, 2021, Plaintiff and Defendant executed the CSA [#22-6], resolving that lawsuit. *Id.* ¶ 30.

In part, Plaintiff agreed to pay Defendant $198,897.16 for post-separation commissions. *Id.* ¶ 31.b. (citing *CSA* [#22-6] at 3 ¶ 12). Because $158,608.51 had already been paid, Plaintiff agreed to pay half of the remaining balance ($20,144.32) within 14 days of the CSA's execution, and the other half ($20,144.33) within 14 days of expiration of the "Restricted Period," which would end two years after the CSA's execution, "provided that Anderson complies with this Agreement through the Restricted Period." *See CSA* [#22-6] at 3-4 ¶¶ 12, 14. The CSA also contained a mandatory ADR provision, stating that, "[t]hrough the Restricted Period, each of the Parties agrees that they will not initiate a claim against any other Party until after they complete the following [ADR] process[.]" *Id.* at 8-9 ¶ 21. Finally, the CSA reaffirmed the Employment Agreement's Kentucky choice-of-law and Colorado choice-of-venue provisions. *Id.* at 9 ¶ 21.d. (stating that "dispute resolution provisions in the Employment Agreement (including the choice-of-law and forum selection provisions) will govern all future disputes between the Parties"). After the CSA was executed, Defendant claims that GSI "failed to remit the

Initial Payment on time" and that GSI "continued to disparage [him] both internally and to its clients and prospective clients[.]" *Id.* ¶¶ 32-34.

On August 5, 2022, GSI sent Plaintiff written notice concerning two alleged breaches of the CSA: "1) hiring a former GSI employee, Matt Williams . . . who had left GSI's employment and asked [Defendant] Anderson for a job and 2) 'openly soliciting' several of GSI's clients." *Id.* ¶¶ 35-36 (footnote omitted). Defendant responded, admitting a "technical violation of the CSA in hiring Mr. Williams" but denying any wrongdoing regarding solicitation. *Id.* ¶¶ 37-38. Defendant and Mr. Williams had a close personal relationship, and Defendant did not believe that he had solicited Mr. Williams; nevertheless, he offered to terminate Mr. Williams' employment but GSI's Chief Operations Officer Nate Beard ("Mr. Beard") told Defendant not to terminate him. *Id.* ¶¶ 41-48. Mr. Beard "acknowledged on a recorded call that he was aware that GSI (through its head of HR, John Hollander . . . ) had been openly disparaging [Defendant] Anderson since the parties executed the CSA." *Id.* ¶ 50. GSI allegedly made another attempt "to bring [Defendant] Anderson on board as a consultant and to elongate the restrictions set forth in the CSA," but Defendant declined those efforts, though he continued to work collaboratively with GSI. *Id.* ¶¶ 51-52.

On August 15, 2023, Defendant sent GSI a letter reminding it that the Restricted Period was sunsetting and reminding it of its Final Payment obligation. *Id.* ¶ 58. However, as of September 5, 2023, "GSI had not made any such payment, nor had it supplied any reason for its delay." *Id.* ¶ 59. When Defendant followed up, GSI's counsel sent another letter raising "issues" to be resolved, conditioning payment on a good faith explanation of Defendant's hiring of Mr. Woodard. *Id.* ¶¶ 61-62. Defendant responded, explaining that

Mr. Woodard "was fired from GSI a year before he was hired at APS GEO" and that Mr. Woodard had been hired "as an engineer/geologist to perform purely engineering work for APS Geo, and in no way violating his non-compete with GSI." *Id.* ¶ 65. Defendant "instructed GSI not to pay the final payment of the CSA of $20,144.32 if GSI truly believed [Defendant] Anderson had breached the CSA as doing so would signal GSI's assent that [Defendant] Anderson had, in fact, complied with his obligations during the Restricted Period." *Id.* ¶ 67. GSI, through counsel, told Defendant that it intended to make the payment and was issuing it that day (September 6, 2023), "[b]ut GSI is not waiving and absolutely does not waive any claims against [Defendant] for breach[.]" *Id.* ¶ 68.

Finally, on February 28, 2024, GSI filed this lawsuit against Anderson. *Id.* ¶ 75. Defendant Anderson argues that GSI "waived its arguments concerning Mr. Williams in 2022" when it told him not to fire Mr. Williams; that Mr. Woodard left GSI in October 2022 and did not join APS Geo until August 21, 2023, after the Restricted Period ended; and that another supposedly solicited GSI employee, Mr. Henderson, "was still a GSI employee[.]" *Id.* ¶¶ 78-87. Regarding Mr. Prine, Defendant acknowledges that covenants for GSI superintendents "typically include a temporal scope of 18 months" and that Geospecialties hired Mr. Prine 17 months after he left GSI. *Id.* ¶¶ 94-96. Finally, Defendant disputes the contents of a letter GSI's counsel sent him in May 2024, which informed him that another former GSI employee, Noel Philippon, was in violation of his non-compete agreement. *Id.* ¶¶ 107-11.

As a result of these allegations, Defendant Anderson asserts five counterclaims: (1) Counterclaim One: breach of contract, *id.* ¶¶ 123-35; (2) Counterclaim Two: breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 136-55; (3) Counterclaim Three:

tortious interference with existing contracts, *id.* ¶¶ 156-66; (4) Counterclaim Four: declaratory judgment pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2001, *id.* ¶¶ 167-71; and (5) Counterclaim Five: abuse of process, *id.* ¶¶ 172-79. Plaintiff's Motion [#43] seeks dismissal of all counterclaims pursuant to Fed. R. Civ. P. 12(b)(6).

## II. Standard of Review

Rule 12(b)(6) tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). However, "[a] pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do. Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted).

### III. Analysis

The Court first addresses Defendant's request to compel the parties to engage in ADR. Second, the Court considers the issue of choice-of-law because it determines which substantive law governs each of the parties' claims. Third, the Court discusses Defendant's premature request for summary judgment on some of Plaintiff's claims. Finally, the Court turns to the parties' arguments asserted pursuant to Rule 12(b)(6).

### A.    ADR

"The Supreme Court has long recognized and enforced a liberal federal policy favoring arbitration agreements."[3] *Nat'l Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1290 (10th Cir. 2004) (citation and internal quotation marks omitted). Under the Federal Arbitration Act ("FAA"), agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. A valid and enforceable arbitration clause "divests a trial court of jurisdiction over all issues that must be submitted to arbitration[.]" *Smith v. Aliera Cos., Inc.*, 534 F. Supp. 3d 1345, 1353 (D. Colo. 2021). However, while "[t]he FAA directs courts to place arbitration agreements on equal footing with other contracts, . . . it does not require parties to arbitrate when they have not agreed to do so." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002) (citation and internal quotation marks omitted).

Here, the CSA contains a mandatory ADR provision:

*Going-Forward Dispute Resolution*. Through the Restricted Period, each of the Parties agrees that they will not initiate a claim against any other Party until after they complete the following process[.]

---

[3] Courts treat ADR clauses and arbitration clauses interchangeably. *See, e.g.*, *Vaughn v. JP Morgan Chase & Co.*, 707 F. Supp. 3d 1042, 1049 (D. Colo. 2023) (citing *City & County of Denver v. Dist. Ct.*, 939 P.2d 1353, 1364 (Colo. 1997)) (discussing an "ADR clause") alongside *Cavlovic v. J.C. Penney Corp., Inc.*, 884 F.3d 1051, 1059 (10th Cir. 2018) (discussing an "arbitration clause")).

*CSA* [#22-6] at 8 ¶ 21. The process includes "mandatory mediation" before any lawsuits may be filed. *Id.* at 9 ¶ 21c. The Restricted Period expired on August 18, 2023. *Id.* at 1, 3-4 ¶ 14; *see also Am. Compl.* [#19], ¶ 18. This lawsuit was filed on February 28, 2024. *See Compl.* [#1] at 12.

In short, Plaintiff asserts that, because it filed this lawsuit after the end of the Restricted Period, it was not required to engage in ADR. *Response* [#42] at 11. Defendant, on the other hand, asserts that the provision applies to any *conduct* which occurred during the Restricted Period, and that it is non-sensical to allow a party to wait until after the period expires to file a lawsuit based on conduct occurring during the relevant period. *Def.'s Motion* [#23] at 20. Both parties cite Kentucky law in their discussion of this issue, so the Court also applies Kentucky law. *See id.* at 18-19 (citing *Carrs Fork Corp. v. Kodak Mining Co.*, 809 S.W.2d 699 (Ky. 1991); *Mitsui Sumitomo Ins. USA, Inc. v. Denham-Blythe Co., Inc.*, 375 F. Supp. 3d 788 (E.D. Ky. 2019)); *Response* [#42] at 11 (citing *Maze v. Bd. of Dirs. for Commonwealth Postsecondary Educ. Prepaid Tuition Tr. Fund*, 559 S.W.3d 354 (Ky. 2018)); *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that [a particular state] law applies, [the court] will proceed under the same assumption.").

Under Kentucky law, contract interpretation is a question of law. *Stowe v. Realco Ltd. Liab. Co.*, 551 S.W.3d 462, 465 (Ky. Ct. App. 2018). Absent ambiguity, "a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Maze*, 559 S.W.3d at 363 (citations and internal quotation marks omitted). "'A contract is ambiguous if a reasonable person would find it susceptible to

different or inconsistent interpretations.'" *Id.* (citation omitted). However, when a contract provision is unambiguous, the court "'look[s] only as far as the four corners of the document to determine the parties' intentions.'" *Id.* (citation omitted); *see also New Life Cleaners v. Tuttle*, 292 S.W.3d 318, 323 (Ky. Ct. App. 2009) (stating that "trial courts are prohibited as a matter of substantive law from modifying or altering a valid and unambiguous written contract" by considering parol evidence). If the court finds a provision ambiguous, its "primary objective is to effectuate the intentions of the parties," but "'[t]he fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms.'" *Maze*, 559 S.W.3d at 363 (citations omitted).

Here, the CSA unambiguously states that, "[t]hrough the Restricted Period"—that is, from August 18, 2021, through August 18, 2023—each party "will not initiate a claim against any other Party until after they complete the following process[.]" *See CSA* [#22-6] at 8 ¶ 21; *id.* at 1, 3-4 ¶ 14. It does not say that the ADR obligation continues after the Restricted Period or that it applies to all claims that arose during the Restricted Period. The plain reading of the ADR provision is that *until August 18, 2023*, neither party could *initiate a claim* against the other without completing the ADR process first. It did not impose any ongoing obligation after the Restricted Period.

Defendant argues that "[i]t necessarily follows that the ADR provision . . . must continue to govern any and all alleged breaches or disputes that occurred <u>during the Restricted Period</u>," but that interpretation reads a new phrase into the CSA that the parties did not include. *Def.'s Motion* [#23] at 20 (emphasis in original). If the parties had wanted the ADR provision to govern any disputes or breaches that arose during the Restricted

Period, they could have said so. *See Pl.'s Motion* [#43] at 4 (arguing "if that was the intent, the parties could have easily written the contract that way") (citing *Newsom v. Newsom*, No. 2017-CA-000457-MR, 2019 WL 2896653, at *2 (Ky. Ct. App. July 5, 2019) ("The parties could have drafted the Agreement to be unenforceable unless reconciliation occurred, but they did not.")).

The Court must interpret the CSA's terms based on their ordinary meaning, without considering extrinsic evidence. *See Maze*, 559 S.W.3d at 363. Here, that meaning is plain and unambiguous: during the Restricted Period ending August 18, 2023, GSI agreed not to initiate a claim against Defendant Anderson before completing mandatory ADR. It is undisputed that Plaintiff GSI filed this lawsuit on February 28, 2024, several months after the Restricted Period ended. Therefore, Plaintiff did not agree to mediate this lawsuit and cannot be so compelled. *See Waffle House, Inc.*, 534 U.S. at 294 (stating that, while ambiguities in an agreement's language must be resolved in favor of arbitration, courts "do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated").

Accordingly, the Court **recommends** that Defendant's Motion [#23] be **denied** to the extent it seeks to compel ADR.

## B.    Choice of Law

The parties disagree about whether Kentucky law or Colorado law governs the tort claims in this action. *See, e.g.*, *Def.'s Motion* [#23] at 15; *Pl.'s Motion* [#43] at 12; *Response* [#42] at 1. While "selecting the applicable law would be unnecessary in the absence of any meaningful conflict between the laws of" Colorado and Kentucky, a court "can select the applicable state law whenever the selection could create *even the*

*possibility* of a different outcome. *See N8 Med., Inc. v. Colgate-Palmolive Co.*, 727 F. App'x 482, 485 (10th Cir. 2018) (emphasis added). Here, differences between Colorado and Kentucky law are potentially dispositive, and therefore the Court addresses which state's law applies to Plaintiff's Claim Two (tortious interference), Plaintiff's Claim Three (civil conspiracy), Plaintiff's Claim Five (CUTSA), Defendant's Counterclaim Three (tortious interference), and Defendant's Counterclaim Five (abuse of process).[4]

When determining which state's substantive law to apply, district courts apply the choice-of-law rules of the state in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Thus, the Court here applies Colorado choice-of-law principles to determine whether Colorado or Kentucky law governs. Choice-of-law determinations are made on a claim-by-claim basis. *Xcel Energy Servs., Inc. v. Nat'l Am. Ins. Co.*, No. 22-cv-02802-CNS-STV, 2023 WL 3764640, at *1 (D. Colo. June 1, 2023).

The Colorado Supreme Court has adopted the Restatement (Second) of Conflict of Laws' "most significant relationship" test for tort claims. *First Nat'l Bank in Fort Collins v. Rostek*, 514 P.2d 314, 320 (Colo. 1973). Under this test, courts consider four factors: (1) the place where the injury occurred; (2) the place where the underlying conduct occurred; (3) the parties' domicile, residence, nationality, place of incorporation, and place

---

[4] There is no dispute that federal substantive law governs Plaintiff's Claim Four (the Defend Trade Secrets Act) and Defendant's Counterclaim Four (Declaratory Judgment). There is also no disagreement that Kentucky law applies to the claims which directly arise from the parties' contractual relations. *See Grynberg*, 538 F.3d at 1346 ("Because the parties' arguments assume that [a particular state] law applies, [the court] will proceed under the same assumption."). Thus, Kentucky law governs Plaintiff's Claim One (breach of contract), Defendant's Counterclaim One (breach of settlement agreement), and Defendant's Counterclaim Two (breach of the implied duty of good faith and fair dealing), the last of which arises in contract rather than tort because this case does not involve an insurance contract. *See Babbs v. Equity Grp. Ky. Div. LLC*, No. 19-CV-00064-GNS, 2019 WL 5225471, at *2 (W.D. Ky. Oct. 16, 2019) (stating that under Kentucky law, plaintiff "cannot bring [an] implied covenant claim in tort as this case does not involve an insurance contract"; instead, he could bring a "breach of the implied covenant of good faith and fair dealing claim as a contract claim").

of business, and (4) the place where the parties' relationship, if any, is centered. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971).

The weight given to these factors varies based on the type of claim at issue. An abuse of process claim is generally "determined by the local law of the state where the proceeding complained of occurred" unless another state has a more significant relationship. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 155 (1971). In trade secret cases, "the place of injury becomes less significant" and "the court should focus most heavily on the place of the defendant's underlying conduct." *N8 Med., Inc.*, 727 F. App'x at 485 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. f). Similar principles govern tortious interference claims: if an entity does business in multiple states and alleges tortious interference, "it is likely that any injury from Defendants' alleged tortious interference occurred in many states, minimizing the weight that should be placed on the 'place of injury' factor in the analysis." *Applied Predictive Techs., Inc. v. MarketDial, Inc.*, 598 F. Supp. 3d 1264, 1288 (D. Utah 2022) (applying the "most significant relationship" test, which Utah has also adopted). In these cases, "the place of [the defendant's] conduct should be given particular weight in determining which state's law is applicable." *Id.* (internal quotation marks omitted).

Weighing these factors, the Court finds that Kentucky has the most significant relationship with Plaintiff's Claim Two (tortious interference), Claim Three (civil conspiracy) and Claim Four (state law trade secret). Defendant "lives and does business" in Kentucky, where his two entities, APS Geo and Geospecialties, also do business. *See Am. Compl.* [#19] ¶¶ 16, 57. Defendant allegedly "misappropriated GSI's trade secrets from Colorado, where [GSI] is housed, and used and possesses [them] in Kentucky[.]" *Id.*

¶ 57. Defendant's alleged tortious interference involved him inducing multiple GSI employees "to breach their respective employment agreements by offering employment with his companies, APS Geo and Geospecialties," both Kentucky entities, "during their respective restricted periods and engaging them to perform work in competition with GSI." *Id.* ¶¶ 16, 45. Moreover, Plaintiff's civil conspiracy claim is predicated on this alleged tortious interference and misappropriation of trade secrets, which involved Defendant's companies and former GSI employees bidding against Plaintiff in various projects in unspecified jurisdictions. *Id.* ¶¶ 48-51. Given the number of impacted projects and GSI's multistate presence, any injury was likely felt in multiple states. On the other hand, Defendant's conduct was centered in Kentucky. The "most significant relationship" test, as applied to Plaintiff's tort claims, points to Kentucky law.

The Court finds that Kentucky also has the most significant relationship to Defendant's Counterclaim Two (tortious interference). Although GSI is a Colorado company with its principal place of business in Colorado, *see Counterclaim* [#22] ¶ 2, Defendant does not allege that GSI has interfered with multi-state projects or bids—rather, its alleged tortious interference is directed at GSI's "attempts to induce" employees of Defendant's companies "to breach [those] employment agreements and work for GSI" and to otherwise interfere with their employment contracts. *Id.* ¶¶ 157-65. The alleged harm is, therefore, not aimed at projects in multiple states but at the employment relationships between Defendant Anderson, his companies, and his employees, which are centered in Kentucky. The only factor that weighs in favor of Colorado is GSI's domicile, but the other considerations weigh toward applying Kentucky law, and the Court

finds that, on balance, Kentucky has the most significant relationship to Defendant's tortious interference claim.

Finally, the Court finds that Colorado has the most significant relationship with Defendant's abuse of process claim. The proceeding about which Defendant Anderson complains is "the current lawsuit" which GSI filed in Colorado. The Restatement directs the Court to apply Colorado law to this claim unless Kentucky has a more significant relationship. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 155 (1971). Given that the current case involves the alleged misuse of federal courts in Colorado and that the at-issue CSA arose from a previous District of Colorado case, *Geostabilization International LLC v. Anderson*, No. 21-cv-01788-CMA-MEH (D. Colo.), the Court finds that Colorado has the most significant relationship to Defendant's abuse of process claim.

In summary, the Court finds that federal law governs Plaintiff's Claim Four (the Defend Trade Secrets Act) and Defendant's Counterclaim Four (Declaratory Judgment); that Colorado law governs Defendant's Counterclaim Five (abuse of process); and that Kentucky law governs all other claims/counterclaims: Plaintiff's Claim One (breach of contract), Plaintiff's Claim Two (tortious interference), Plaintiff's Claim Three (civil conspiracy), Plaintiff's Claim Five (CUTSA),[5] Defendant's Counterclaim One (breach of settlement agreement), Defendant's Counterclaim Two (breach of the implied duty of good faith and fair dealing), and Defendant's Counterclaim Three (tortious interference).

---

[5] While CUTSA itself is clearly governed by Colorado law, the Court finds in Section III.D.1.c. below that Kentucky's version of this statute should govern Plaintiff's state law trade secrets claim.

**C.      Fed. R. Civ. P. 56**

Defendant seeks summary judgment in his favor on Plaintiff's Claim One (breach of contract) and Claim Four (DTSA). *Def.'s Motion* [#23] at 1, 1 nn. 4-5, 10 n.39.[6] However, Defendant has not complied with the District Judge's Standing Order Regarding Rule 56 Motions (effective December 1, 2022), which requires parties to notify her Chambers before filing a summary judgment motion so that she can "schedule a hearing with the parties to discuss the material facts and to determine whether there are disputes of any material facts." RMR Standing Order Regarding Rule 56 Motions § III. Further, this Standing Order expressly states that "[n]o party shall file an early motion for summary judgment without first obtaining leave of the Judge or Magistrate Judge," which has not occurred here. *Id.* § V. In addition, Defendant did not submit a chart or statement of undisputed material facts, which is also in violation of the Standing Order. *Id.* § IV.A.-G. These violations alone are sufficient grounds to deny Defendant's request for summary judgment. *Id.* § IV.I. ("Motions for summary judgment filed without adhering to these procedures may be stricken for noncompliance.").[7]

---

[6] Although Defendant twice refers to Claims One and Four here, the text of his summary judgment argument, which is based on waiver, appears to focus on Claim One (breach of contract) and Claim *Two* (tortious interference with contract), without any explicit discussion of Claim Four (DTSA). *See generally Def.'s Motion* [#23] at 10-15; *see also Pl.'s Response* [#44] at 4-5. However, for the reasons explained below, the precise claims subject to Defendant's waiver argument are immaterial for resolution of Defendant's summary judgment request.

[7] Even assuming Defendant's summary judgment request was properly before the Court, the request should likely be denied at this time anyway. Under Kentucky law, legal waiver "is a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon." *Dunn v. Gordon Food Servs., Inc.*, 780 F. Supp. 2d 570, 576 (W.D. Ky. 2011) (citation omitted). Waiver can be express or implied based on a party's conduct, though whether certain conduct amounts to waiver is a question of law for the Court to determine. *Clift v. RDP Co.*, 200 F. Supp. 3d 660, 672-73 (W.D. Ky. 2016). Here, however, the evidence appears to be insufficient for the Court to conclude, as a matter of law, that Plaintiff's conduct amounted to a waiver of any claims. By way of example only, Defendant asserts, via sworn affidavit, that he offered to terminate Mr. Williams' employment

Accordingly, the Court **recommends** that Defendant's Motion [#23] be **denied without prejudice** to the extent he seeks summary judgment on any of Plaintiff's claims.

D.    **Fed. R. Civ. P. 12(b)(6)**

1.    **Plaintiff's Claims**[8]

a.    **Claim Two (Tortious Interference)**

Under Kentucky law, a tortious interference with contractual relations claim requires: "1) the existence of a contract; 2) defendant's knowledge of the contract; 3) defendant's intent to cause a breach of that contract; 4) that defendant's actions in fact caused a breach of the contract; 5) that plaintiff suffered damages as a result of the breach; and 6) that defendant enjoyed no privilege or justification for its conduct." *Seeger Enters., Inc. v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791, 795 (Ky. Ct. App. 2017).

Here, Defendant only argues that Plaintiff "fails to include the final element, that Defendant Anderson had no privilege or justification to excuse [his] conduct." *Def.'s Motion* [#23] at 16 (alteration in original) (citation and internal quotation marks omitted). Plaintiff argues that it satisfied this element by describing Defendant Anderson's conduct as "improper" and that, taken in the context of the whole complaint, its allegations are sufficient to show tortious interference with the contracts of three former GSI employees. *Response* [#42] at 8.

---

with APS Geo immediately, but that GSI's agent Mr. Beard told him not to, and that GSI took no further action until filing this suit. *See Def.'s Motion* [#23] at 12-13; *see also Aff. of Def.* [#23-13] ¶¶ 20-25. Even if true, this does not unequivocally demonstrate waiver—GSI may have had any number of reasons for not directing Defendant Anderson to immediately fire Mr. Williams and for waiting until after the Restricted Period to pursue legal action based on this alleged breach.

[8] Defendant has not challenged Plaintiff's Claim One (breach of contract) or Claim Four (DTSA) under Rule 12(b)(6); rather, he merely sought summary judgment on these claims based on the waiver issue, which the Court addressed in Section III.C. above. *See Def's Motion* [#23] at 1.

"Tortious interference claims turn on the defendant's motive, requiring the plaintiff to 'show malice or some significantly wrongful conduct.'" *PNC Bank, N.A. v. Merenbloom*, Nos. 15-6361, 16-5277, 2017 WL 3973962, at *3 (6th Cir. June 16, 2017) (quoting *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988)); *see also Bourbon Cnty. Joint Plan. Comm'n v. Simpson*, 799 S.W.2d 42, 45 (Ky. Ct. App. 1990) (stating that, to pursue an interference with contract claim, "malice must be shown, but only in the sense of a lack of justification for the interference"). Conclusory allegations that a defendant acted "intentionally without any lawful or reasonable justification" and with "improper" motive are generally insufficient to state a plausible claim, but courts consider whether the complaint's allegations, taken as a whole, suggest wrongful conduct. *PNC Bank, N.A.*, 2017 WL 3973962, at *3 (affirming dismissal of tortious interference claim where, taken as a whole, "the [plaintiffs'] allegations suggested that [the defendant] acted in accordance with the terms of the construction loan agreement"); *see also Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 534 (Ky. Ct. App. 2005) (holding that, to establish the element of *improper* interference with an existing or prospective contract, "it was incumbent upon [the plaintiff] to have asserted facts which, if true, would show that [the defendant] acted maliciously or engaged in wrongful conduct").

Here, the sufficiency of Plaintiff's allegations on this element is a close call, as the conclusory assertion that Defendant acted "intentionally and improperly," when taken alone, is inadequate. *See Am. Compl.* [#19] ¶ 45. However, taken as a whole, the Amended Complaint [#19] alleges sufficient additional facts to suggest that Defendant acted maliciously, "in the sense of a lack of justification for the interference[,]" or engaged in wrongful conduct. *Simpson*, 799 S.W.2d at 45. Specifically, Plaintiff alleges that through

Defendant Anderson's employment with GSI, Defendant knew or should have known that other GSI employees, including Messrs. Williams, Woodard, and Prine, were bound by non-compete agreements similar to his, but he hired them anyway during their non-compete periods. *Am. Compl.* [#19] ¶ 44. Plaintiff alleges that Defendant Anderson signed a CSA extending his non-compete and non-solicitation period by two years and representing that he had no intention to compete with GSI, but that these representations were false. *Id.* ¶¶ 20-21. Defendant even allegedly admitted to GSI that his hiring of Mr. Williams was a breach of the CSA. *Id.* ¶ 25. Moreover, Plaintiff alleges that Defendant Anderson and his companies intentionally obfuscated Mr. Williams', Mr. Woodard's, and Mr. Prine's employment to make it appear as though they were engaged in permitted engineering and design work when, in fact, they "performed work on behalf of, and in coordination with, Geospecialties," in direct competition with GSI. *Id.* ¶¶ 22-24. Because Plaintiff has asserted allegations tending to show that Defendant acted maliciously or engaged in wrongful conduct, the Court finds that Plaintiff has sufficiently alleged the sixth element of tortious interference with contract under Kentucky law.

Accordingly, the Court **recommends** that Defendant's Motion [#23] be **denied** to the extent Defendant seeks dismissal of Plaintiff's Claim Two (tortious interference).

### b.    Claim Three (Civil Conspiracy)

Under Kentucky law, a civil conspiracy claim requires "an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 422-23 (6th Cir. 2013) (citation and internal quotation marks omitted); *see also Vivid Impact Co., LLC v. Ellis*, No. 3:17-CV-509-JHM, 2017 WL 5505024, at *5 (W.D. Ky. Nov. 16,

2017) (distilling this standard into a four-element test: "(1) an agreement or combination, (2) that is unlawful or corrupt, (3) entered into by two or more persons, (4) for the purpose of accomplishing an unlawful goal.").

The Kentucky Court of Appeals has adopted the intracorporate conspiracy doctrine, which holds that "a corporation cannot conspire with its employees, and its employees, when acting within the scope of their employment, cannot conspire among themselves." *Cowing v. Commare*, 499 S.W.3d 291, 294 (Ky. Ct. App. 2016) (citation and quotation marks omitted). Under this doctrine, a corporate entity cannot conspire with its own employees or agents. *Id.* (citing *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509-10 (6th Cir. 1991) (stating that, because a corporation and its employees "are members of the same collective entity," "there are not two separate 'people' to form a conspiracy")). The doctrine logically follows from legal authority holding that "'a corporation can only act through its agents[,]' . . . and that a conspiracy involves 'two or more persons[.]'" *Id.* (citations omitted).

Here, Plaintiff alleges two conspiratorial agreements: (1) that Defendant "Anderson and his entities agreed to make it appear as though [GSI's former] employees were hired by APS Geo, a strictly engineering and design centric firm when, in reality, they also performed work on behalf of, and in coordination with, Geospecialties"; and (2) that Defendant "Anderson, APS Geo, and Geospecialties have also agree[d] to use and have in fact used GSI's trade secret and proprietary information related to GSI's bidding process and structure to create bids against GSI on specific projects[.]" *Am. Compl.* [#19] ¶¶ 49, 51. Thus, both alleged conspiratorial agreements involve Defendant Anderson and entities he incorporated. *Id.* ¶ 16.

Accepting Plaintiff's allegations as true, Defendant Anderson, APS Geo, and Geospecialties are plainly "members of the same collective entity"; Defendant allegedly incorporated them for his own benefit, to compete with GSI, and he acts on their behalf as a member, or perhaps the sole member, of each.[9] *See Hull*, 926 F.2d at 509-10. Although the corporate form creates separate legal identities, by virtue of Defendant Anderson's individual control over them, APS Geo and Geospecialties are not meaningfully separate "people" from Defendant Anderson who allegedly conspired with him. Given the overlap of identities, while Plaintiff alleges that Defendant Anderson and his two entities "agreed to" undertake certain actions, it offers no details about what that agreement entailed—after all, if Defendant Anderson is the sole member and controls these entities, there was no need to "agree" on a course of conduct because Defendant Anderson could simply decide for them. *See, e.g.*, *Def.'s Motion* [#23] at 18 (pointing out that Plaintiff omits any allegations of "what the referenced entities did, or any communications these entities made, other than [Defendant] Anderson").

Plaintiff argues that an exception to the intracorporate conspiracy doctrine applies because Defendant Anderson had an "independent personal stake in achieving the corporation's illegal objective." *Response* [#42] at 9 (quoting *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994)). For two reasons, the Court is unpersuaded. First, the Sixth Circuit has squarely rejected *Brever*'s "independent personal stake" rule. *See Barrow v. City of Hillview, Ky.*, 775 F. App'x 801, 808 (6th Cir. 2019) ("*Brever* does not bear the weight Plaintiffs put on it. Although the specific phrasing of the 'independent

---

[9] Here, the Court draws from Plaintiff's Response [#42] where it asserts, "[u]pon information and belief, Anderson is the sole member of the two competing entities, APS Geo and Geospecialties." *See Response* [#42] at 9.

personal stake' rule supports Plaintiffs' proposed exception, the facts of that case demonstrate that the conspirators were also acting outside the scope of their employment."). Second, Plaintiff's own allegations belie its assertion that Defendant Anderson had an "independent personal stake" in recruiting former GSI employees and using GSI trade secrets. Notably, APS Geo and Geospecialties were allegedly "intended to be large-scale businesses formed to directly compete with GSI by recruiting its former employees and using its proprietary information," both of which were formed because Mr. "Anderson had long been planning to compete directly with GSI[.]" *Am. Compl.* [#19] ¶ 16. Taking Plaintiff's allegations as true, Defendant Anderson, APS Geo, and Geospecialties' interests are and always have been aligned, and with respect to their alleged solicitation and competition with GSI, they have never acted as separate "people" who could form a conspiracy.

Whether Defendant Anderson has been acting as APS Geo's and Geospecialties' agent, or whether he has been using both entities as his own instrumentality, the intracorporate conspiracy doctrine bars Plaintiff's civil conspiracy claim. *See, e.g.*, *Cowing*, 499 S.W.3d at 294-95 (affirming summary judgment for employer and supervisor on civil conspiracy claim because "[the supervisor's] conduct was solely attributable to [the employer]", meaning "the requirement of a multiplicity of actors has not been met"); *Dunn v. Gordon Food Servs.*, No. 3:10-CV-00335-R, 2010 WL 4180503, at *2 (W.D. Ky. Oct. 20, 2010) (finding civil conspiracy claims against supervisor and employer were barred by the intracorporate conspiracy doctrine).

Accordingly, the Court **recommends** that Defendant's Motion [#23] be **granted** to the extent that Plaintiff's Claim Three (civil conspiracy) be **dismissed with prejudice**.

*See Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190-91 (10th Cir. 2014) (stating that, when a complaint fails to state claim under Rule 12(b)(6) and granting leave to amend would be futile, dismissal with prejudice is appropriate).

### c. Claim Five (CUTSA)

Plaintiff alleges that Defendant has misappropriated its trade secrets—namely, "information relating to GSI's bidding process and strategy, including information developed over years of experience and which is known only to GSI"—in violation of CUTSA. *Am. Compl.* [#19] ¶¶ 51, 61. Defendant argues that because Kentucky law applies rather than Colorado law, Plaintiff has failed to state a claim. However, Defendant admits that Kentucky "does recognize a similar claim, the Kentucky Uniform Trade Secret Act ('KUTSA') . . . though this has not been specifically pled in this action." *Def.'s Motion* [#23] at 19. Plaintiff asserts that it has sufficiently pleaded all the elements of a KUTSA claim even if stated as a CUTSA claim. *See Response* [#42] at 10 (arguing that it "makes sufficient allegations to sustain a claim under both Colorado and Kentucky law should the Court find Kentucky law applies").

Colorado and Kentucky have enacted very similar versions of the Uniform Trade Secrets Act. *See* Colo. Rev. Stat. § 7-74-101 *et seq.* ("CUTSA"); Ky. Rev. Stat. Ann. § 365.880 *et seq.* ("KUTSA"). Substantively, CUTSA and KUTSA are largely identical—both allow a plaintiff to recover damages for misappropriation, including "actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." KY. REV. STAT. ANN. § 365.884(1); COLO. REV. STAT. § 7-74-104(1). However, the respective exemplary damages provisions differ. CUTSA allows "the court or the jury" to award exemplary damages "[i]f the

misappropriation is attended by circumstances of fraud, malice, or a willful and wanton disregard of the injured party's right and feelings," with such damages limited to "an amount not exceeding the award made under subsection (1) of this section." Colo. Rev. Stat. § 7-74-104(2). KUTSA, on the other hand, provides that, "[i]f willful and malicious appropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (1)." KY. REV. STAT. ANN. § 365.884(2).

"To prevail under KUTSA, [p]laintiffs must show both misappropriation and that the information misappropriated qualifies as trade secrets under KUTSA." *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 794 (W.D. Ky. 2001). As relevant here, KUTSA defines "misappropriation" as including "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]" KY. REV. STAT. ANN. § 365.880(2)(b)2.b. "Improper means" is defined as including "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means[.]" KY. REV. STAT. ANN. § 365.880(1). A "trade secret" is "information, including a formula, pattern, compilation, program, data, device, method, technique, or process" that both "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and is subjected to reasonable efforts to maintain its secrecy. KY. REV. STAT. ANN. § 365.880(4).

Here, because the Court has found that Kentucky law, rather than Colorado law, governs Plaintiff's trade secrets claims, Defendant correctly asserts that KUTSA, rather than CUTSA, applies. However, Plaintiff correctly asserts that it has stated all the elements of a KUTSA misappropriation claim. It has plausibly alleged that its bidding process and strategy constitutes a trade secret under KUTSA. Specifically, the bidding process and strategy is a "process" with independent economic value derived from its secrecy, and Plaintiff has taken reasonable efforts to maintain its secrecy, such as including a provision in Defendant Anderson's Employment Agreement that "he would not use GSI's confidential or proprietary information for his own benefit, or for the benefit of any person or entity other than GSI." *Am. Compl.* [#19] ¶¶ 13-14. Plaintiff has also plausibly alleged that Defendant Anderson misappropriated this information, i.e., that he used it without GSI's consent "to create bids against GSI on specific projects," knowing that his knowledge of it was acquired under circumstances that gave rise to a duty of secrecy and limitation on use. *Id.* ¶¶ 21, 51. This sufficiently alleges "both misappropriation and that the information misappropriated qualifies as trade secrets under KUTSA." *Auto Channel, Inc.*, 144 F. Supp. 2d at 794.

In summary, the Court finds that GSI's Claim Five is pleaded under the wrong state's Uniform Trade Secrets Act, but Defendant cites no authority, and the Court is aware of none, holding that this kind of technical error warrants a dismissal with prejudice, especially where the complaint plausibly states the necessary elements of the correct state's statute.

Accordingly, to clarify the pleadings, the Court **recommends** that Defendant's Motion [#23] be **granted** to the extent that Plaintiff's Claim Five (CUTSA) be **dismissed**

because it is pleaded under the wrong state's law, but that Plaintiff be given leave to file an amended complaint that substitutes a KUTSA claim in its place.

### 2.    Defendant's Counterclaims

#### a.    Counterclaim One (Breach of Contract)

Under Kentucky law, a breach of contract claim has three elements: (1) existence of a contract; (2) breach of that contract; and (3) the breach caused damages. *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019). Here, Defendant alleges that Plaintiff has breached the parties' CSA [#22-6] in four specific ways: (1) by "failing to adhere to the mandatory ADR provisions"; (2) "when its officers and agents openly disparaged [Defendant] Anderson on several occasions, both internally and externally to clients and prospective clients"; (3) "failing to remit the Initial Payment on time"; and (4) "failing to timely remit the Final Payment to [Defendant] Anderson on or before September 1, 2023, when it was due." *Counterclaims* [#22] ¶¶ 127, 131, 133-34.

#### i.    ADR Provision

Plaintiff argues that the ADR provision had expired by the time it filed this lawsuit, so, by the CSA's plain terms, there was no breach of the mandatory ADR provision. *See Pl.'s Motion* [#43] at 3-4. As discussed in Section III.A. above, the Court finds that the ADR provision's terms are plain and unambiguous. Plaintiff did not agree to mediate this lawsuit, because it was filed several months after the Restricted Period ended, and it cannot be compelled to mediate. Thus, Defendant has not adequately alleged breach of the CSA on this basis.

Accordingly, the Court **recommends** that Plaintiff's Motion [#43] be **granted** to the extent that Defendant's Counterclaim One (breach of contract) be **dismissed with**

**prejudice in part** with respect to GSI's alleged violation of the ADR provision. *See Knight*,

749 F.3d at 1190-91.

ii.     **Disparagement**

Plaintiff argues that Defendant's allegations of disparagement are conclusory and

not well-pleaded because "[his] averments lack *any* content of the allegedly disparaging

statements." *Pl.'s Motion* [#43] at 4. In full, the pertinent allegations are as follows:

- "Following execution of the CSA, the parties had little contact, though [Defendant] Anderson was informed by several clients and others in the industry that GSI, through its officers, had been openly disparaging him, in violation of the parties' non-disparagement provision."

- "GSI continued to disparage [Defendant] Anderson both internally and to its clients and prospective clients since signing the CSA."

- "In the same exchange, [Defendant] Anderson advised GSI of its own breaches of the CSA—namely violations of the parties' mutual Non-Disparagement provision."

- "GSI failed to respond to the remainder of [Defendant] Anderson's response, specifically failing to deny [Defendant] Anderson's allegations of GSI's disparagement towards him."

- "Mr. Beard acknowledged on a recorded call that he was aware that GSI (through its head of HR, John Hollander . . . ) had been openly disparaging [Defendant] Anderson since the parties executed the CSA."

- "Upon information and belief, Mr. Ivankovich made several attempts to try to solicit Mr. Woodard to return to GSI, and in doing so openly disparaged [Defendant] Anderson."

- "GSI has also breached the Parties' CSA when its officers and agents openly disparaged [Defendant] Anderson on several occasions both internally and externally to clients and prospective clients."

- "These breaches of the non-disparagement provision of the CSA have caused [Defendant] Anderson damages in an amount to be proven at trial."

*Counterclaims* [#22] ¶¶ 33, 34, 45, 49, 50, 85, 131, 132. The CSA [#22-6] clarifies that, "[f]or purposes of this Agreement, the term 'disparage' means to make any negative written or oral comment to any person or entity that could adversely affect any other Party's reputation." *See CSA* [#22-6] at 6 ¶ 17.

The Court agrees that Defendant's allegations of "disparagement" are purely conclusory—that is to say, the "inference is asserted without 'stating underlying facts' or including 'any factual enhancement.'" *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023) (citation omitted); *see also Big Squid, Inc. v. Domo, Inc.*, No. 2:19-cv-193, 2019 WL 3555509, at *10 (D. Utah Aug. 5, 2019) (finding allegations that the defendant engaged in "deceit" and "disparaged" the plaintiff were "conclusory, and fail to put [the defendant] on notice of what actions, if any, constituted deceit and disparagement"). After reading Defendant's Counterclaims [#22], the Court cannot determine what was said about Defendant Anderson, to whom, or in what context.[10] Because the allegations that GSI disparaged him are conclusory and lack factual enhancement, he has failed to state a claim for breach of the CSA's non-disparagement clause.

Accordingly, the Court **recommends** that Plaintiff's Motion [#43] be **granted** to the extent that Defendant's Counterclaim One (breach of contract) be **dismissed without prejudice in part** with respect to GSI's alleged violation of the non-disparagement clause. *See Reynoldson v. Schillinger*, 907 F.2d 124, 126 (10th Cir. 1990) (explaining that, if "it is at all possible that the party against whom the dismissal is directed can correct the

---

[10] To the extent Defendant claims that "further discovery is needed to determine the extent of the disparaging comments," *Response* [#53] at 7, he has it backward: "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

defect in the pleading or state a claim for relief," a court dismisses without prejudice so that the litigant can seek leave to amend).

### iii.    Initial Payment

Plaintiff argues that Defendant has not plausibly alleged that the Initial Payment was untimely because a mere "alleg[ation] that a payment was 'late' is insufficient to state a claim[.]" *See Pl.'s Motion* [#43] at 6. Plaintiff also argues that Defendant has not plausibly alleged damages resulting from the alleged breach. *Id.* at 6-7.

The Court finds that Defendant has plausibly alleged that the Initial Payment was late. He alleged that the CSA's Effective Date was August 18, 2021, that GSI had agreed to pay $20,144.32 within 14 days of the Effective Date, and that GSI "failed to remit the Initial Payment on time[.]" *See Counterclaims* [#22] ¶¶ 30, 31.b., 32; *see also CSA* [#22-6] at 1 (specifying August 18, 2021 as the "Effective Date"), 3 ¶ 12 (establishing payment obligations). These allegations are not conclusory—Defendant specifically alleged how much he was owed and when it was owed, and he specifically alleged that he was not paid by that time. It is also plausible that this delay in payment, if one occurred, caused damages, even if those damages are minimal. *See, e.g.*, *Gilbert v. Bowling Green Marine, Inc.*, No. 2009-CA-002403-MR, 2011 WL 1085369, at *6 (Ky. Ct. App. Mar. 25, 2011) (stating that "failure to make timely payments amounted to a breach of contract").

Plaintiff asks the Court to consider a Payment Log [#43-1] it attached to its Motion [#43] under Rule 56. *See Pl.'s Motion* [#43] at 7. Defendant retorts that Plaintiff's request for summary judgment is premature, unsupported and is, at best, "a factual dispute between the Parties that is not appropriate for the Court's adjudication at this time." *Response* [#53] at 8. The Court agrees with Defendant. The Payment Log [#43-1] seems

to indicate that a gross payment amount of $20,144.33 was issued from Accounts Payable to "Justin Anderson / reimbursement" with a paid date of "08/26/21," but it is not authenticated by any affidavit, declaration, or other evidence and, at any rate, it does not disprove Defendant's argument that he did not timely receive the payment from GSI. *See Payment Log* [#43-1]; *Response* [#53] at 7 (arguing that GSI's Chief Financial Officer "admitted in writing to [Defendant] Anderson on August 31, 2021 (the day *after* the [payment] was due" that GSI had made a mistake). Just as the Court found that Defendant's request for summary judgment on the issue of waiver was premature and in violation of the District Judge's Standing Order, the same is true of Plaintiff's similar request, which should be denied for the same reasons.

Accordingly, the Court **recommends** that Plaintiff's Motion [#43] be **denied** under both Rules 12(b)(6) and 56 with respect to Defendant's Counterclaim One (breach of contract) to the extent Plaintiff seeks dismissal and/or entry of judgment regarding the Initial Payment's timeliness.

### iv.    Final Payment

Plaintiff argues that Defendant's breach of contract claim regarding the Final Payment should be dismissed because (1) he has not plausibly alleged damages; (2) he waived his breach of contract claim by telling GSI not to make the payment; and (3) he is estopped from asserting that the Final Payment was untimely. *See Pl.'s Motion* [#43] at 7-9. The Court begins with the second argument, finding it dispositive.

As previously discussed, under Kentucky law, legal waiver "is a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon." *Dunn v.*

*Gordon Food Servs., Inc.*, 780 F. Supp. 2d 570, 576 (W.D. Ky. 2011) (citation omitted).

Waiver can be express or implied based on a party's conduct, though whether certain

conduct amounts to waiver is a question of law for the court to decide. *Clift v. RDP Co.*,

200 F. Supp. 3d 660, 672-73 (W.D. Ky. 2016).

Here, Defendant plausibly states a breach of contract. He alleges that, under the

CSA, the Final Payment was due on or before September 1, 2023. *See Counterclaims*

[#22] ¶ 58. On September 5, 2023, he followed up and GSI responded, raising "issues"

to be resolved. *Id.* ¶¶ 60-61. This plausibly alleges that GSI did not timely remit the Final

Payment when it was owed under the CSA. However, Defendant further alleges that, the

same day, he "instructed GSI <u>not to pay</u> the final payment of the CSA of $20,144.32 if

GSI truly believed [Defendant] Anderson had breached the CSA as doing so would signal

GSI's assent that [Defendant] Anderson had, in fact, complied with his obligations during

the Restricted Period." *Id.* ¶ 67 (emphasis in original). He alleges that GSI responded that

it intended to (and was making) the Final Payment but without waiving any claims for

breach of the CSA. *Id.* ¶ 68. He admits that on or about September 6, 2021, "GSI sent a

wire for the outstanding amount of $20,144." *Id.* ¶ 73.

Defendant admits that GSI issued the payment owed under the Agreement, so the

only actionable breach could be the fact that it issued that payment *late*. However, by

telling GSI not to pay him the Final Payment if it believed he had breached the

Agreement—and he knew that GSI likely believed that—Defendant expressly waived an

argument that the payment was untimely. By telling it not to pay him at that time,

Defendant unequivocally, voluntarily, and intentionally surrendered his right to insist that

GSI make prompt payment. Here, "the [pleading] itself admits all the elements of the

affirmative defense [of waiver] by alleging the factual basis for those elements."
*Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).

Accordingly, the Court **recommends** that Plaintiff's Motion [#43] be **granted** to the extent that Defendant's Counterclaim One (breach of contract) be **dismissed without prejudice** with respect to the allegedly late Final Payment. *See Reynoldson*, 907 F.2d at 126.

### b.    Counterclaim Two (Breach of Duty of Good Faith and Fair Dealing)

Defendant alleges that Plaintiff has breached the implied covenant of good faith and fair dealing with respect to the CSA by: (1) failing to substantiate claimed disputes of the agreement during the Restricted Period, *see CSA* [#22-6] at 9 ¶ 21.a.; (2) "violat[ing] the plain terms of the CSA's requirement for mandatory ADR," *see id.* at 9 ¶ 21.c.; and (3) "serv[ing] [Defendant] Anderson personally at work, at his office in front of his employees, despite knowing that [Defendant] Anderson has been represented by counsel since 2021." *Counterclaims* [#22] ¶¶ 145-50. Plaintiff argues that this claim fails because both (1) and (2) above are premised on Mr. Anderson's incorrect reading of the CSA's mandatory ADR clause, and because a party acting according to the express terms of a contract cannot be considered in breach of the implied covenant. *Pl.'s Motion* [#43] at 9-10 (citing *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997)).

Under Kentucky law, "a claim for breach of the covenant of good faith and fair dealing cannot stand alone as an independent cause of action, [but] it may be asserted as a claim for breach of an implied term of a contract." *Epps Chevrolet Co. v. Nissan N. Am., Inc.*, 99 F. Supp. 3d 692, 703 (E.D. Ky. 2015). However, "the implied covenant of good faith 'does not preclude a party from enforcing the terms of the contract.'" *Id.* (quoting

*Hunt Enters. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 700 (W.D. Ky. 1997)).
Thus, where a party's conduct is "done in accordance with the express terms of the
contract, [a] plaintiff [can]not state a claim for breach of the implied covenant[.]" *Id.*
(discussing the holding in *Hunt Enters.*, 18 F. Supp. 697); *see also Big Yank Corp.*, 125
F.3d at 313 (stating that "a party's acting according to the express terms of a contract
cannot be considered a breach of the duties of good faith and fair dealing") (collecting
cases).

The Court's straightforward interpretation of the ADR clause, *see supra* § III.A.,
precludes any breach of implied covenant claim arising from GSI's alleged failure to
engage with the ADR process during the Restricted Period. The Court has found, as a
matter of law, that because Plaintiff did not file this lawsuit until after the Restricted Period,
it had not agreed to mandatory ADR and cannot be compelled to mediate. With respect
to ADR, GSI acted in accordance with the CSA's plain and unambiguous terms, so it
cannot have breached the implied covenant.

Regarding his service of process theory, Defendant identifies no provision of the
CSA, either express or implied, that would prohibit GSI from serving process on him in a
manner expressly allowed under the Federal Rules of Civil Procedure after the Restricted
Period had ended. *See* Fed. R. Civ. P. 4(e)(2)(A) (providing that service of process may
be effectuated by "delivering a copy of the summons and of the complaint to the individual
personally"). GSI was not required to attempt service of process on Defendant Anderson
through his attorney, and Defendant does not explain how its failure to do so violated
either an express or implied term of the CSA.

Accordingly, the Court **recommends** that Plaintiff's Motion [#43] be **granted** to the extent that Defendant's Counterclaim Two (breach of implied duty of good faith and fair dealing) be **dismissed without prejudice**. *See Reynoldson*, 907 F.2d at 126.

### c.    Counterclaim Three (Tortious Interference)

As previously discussed, under Kentucky law, to state a claim for tortious interference with contractual relations, a plaintiff must show: "1) the existence of a contract; 2) defendant's knowledge of the contract; 3) defendant's intent to cause a breach of that contract; 4) that defendant's actions in fact caused a breach of the contract; 5) that plaintiff suffered damages as a result of the breach; and 6) that defendant enjoyed no privilege or justification for its conduct." *Seeger Enters., Inc.*, 518 S.W.3d at 795 (citation omitted). A mere *attempt* to interfere with a contract is insufficient—the interference must succeed. *See Littrell v. Bosse*, 581 S.W.3d 584, 587 (Ky. Ct. App. 2019) (affirming summary judgment for defendant on tortious interference claim where the alleged interference with the plaintiff's employment relationship "was unsuccessful because the college renewed [the plaintiff's] contract. Harm without injury is not a tort.").

Among other things, GSI argues that Defendant's tortious interference claim fails on the fourth element because he does not allege that any of the former employees actually breached or failed to perform their contracts with Defendant or his companies. *See Pl.'s Motion* [#43] at 15-16. For the following reasons, the Court agrees.

Defendant alleges that Plaintiff "has made repeated attempts to induce the Anderson Companies employees to breach [their] employment agreements and work for GSI." *Counterclaims* [#22] ¶ 160. He alleges that these efforts are "interfering with current GSI employees from seeking employment away from GSI, specifically at the Anderson

Companies." *Id.* ¶ 161. He adds that "GSI's recent threats against Mr. Phillippon [sic] are intended to force him to breach his employment agreement with Geospecialties without justification." *Id.* ¶ 163. Elsewhere, Defendant Anderson alleges that GSI, through Mr. Ivankovich, "began directly contacting Mr. Woodard to attempt to induce him to leave APS GEO and return to GSI," but he does not allege that these efforts were successful. *Id.* ¶ 84. In fact, Defendant does not allege that even one Anderson Company employee has breached an employment agreement with APS Geo or Geospecialties because of GSI's interference.

"Interference with a contractual relationship requires actual interference with the contract *and impairment of the contract*." *Littrell*, 581 S.W.3d at 588 (emphasis in original). Because Defendant does not allege that GSI's "actions in fact caused a breach of the contract," he has failed to state a claim of tortious interference with contract under Kentucky law. *See Seeger Enters.*, 518 S.W.3d at 795; *Littrell*, 581 S.W.3d at 587-88 (affirming summary judgment for defendant on tortious interference claim where the plaintiff had not shown any actual impairment of his employment relationship).

Accordingly, the Court **recommends** that Plaintiff's Motion [#43] be **granted** to the extent that Defendant's Counterclaim Three (tortious interference with contract) be **dismissed without prejudice**. *See Reynoldson*, 907 F.2d at 126.

### d.    Counterclaim Five (Abuse of Process)

To state an actionable claim for abuse of process, a plaintiff must plausibly allege: "(1) an ulterior purpose for the use of a judicial proceeding; (2) willful action in the use of that process which is not proper in the regular course of the proceedings, that is, use of a legal proceeding in an improper manner; and (3) resulting damage." *Walker v. Van*

*Laningham*, 148 P.3d 391, 394 (Colo. App. 2006) (citations omitted). The second element—improper use of a legal proceeding—is "[t]he essential element of an abuse of process claim," and it is determined objectively. *Sterenbuch v. Goss*, 266 P.3d 428, 439 (Colo. App. 2011); *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 373 (Colo. App. 1994) (noting that whether there was "an improper *use* of the process" must be "viewed objectively") (emphasis in original).

"A litigant uses the legal proceeding in an improper manner when he seeks to use the process to accomplish a coercive goal," such as "the surrender of property or the payment of money, by the use of the [legal proceeding] as a threat or a club." *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1117-18 (10th Cir. 2009) (citations and internal quotation marks omitted). "Examples of improper use of process include recording a lis pendens or obtaining a writ of replevin as leverage to demand money, property, or some other advantage in exchange for a release or dismissal of the action." *Yadon v. Lowry*, 126 P.3d 332, 337 (Colo. App. 2005).

Here, Defendant alleges that GSI has brought the current lawsuit "for a number of improper and ulterior purposes," such as to cover up its shrinking market share and "explain its crumbling numbers to its purchaser," to slow Defendant's companies' growth, and to hide this lawsuit its Kentucky customers. *Counterclaims* [#22] ¶ 174. Plaintiff argues that Defendant has failed to state an abuse of process claim because he has not "plausibly allege[d]—as a separate element—GSI's 'willful action in the use of . . . a legal proceeding in an improper manner.'" *Pl.'s Motion* [#43] at 19 (quoting *Walker*, 148 P.3d at 394). Again, the Court agrees. Defendant does not allege a single specific and objectively improper use of the process—instead, he asserts in conclusory fashion that

GSI "has acted willfully in the use of the legal process of Colorado that is improper in the regular conduct of these proceedings" and that "this process is not intended to aid GSI in its ulterior and improper purposes." *Counterclaims* [#22] ¶¶ 175-76.

This is insufficient to state an abuse of process claim because it entirely omits the second element. Even if GSI's filing of this lawsuit was motivated by an ulterior purpose, and even if it is ultimately found to be meritless, that is not enough: Defendant must plausibly allege that Plaintiff "took [some] further improper or coercive action to obtain a collateral advantage not properly included in the process itself." *Walker*, 148 P.3d at 395. Defendant does not allege any action that could be objectively viewed as an improper use of the legal process.

Additionally, if Defendant is asserting that the lawsuit's filing *is* the abuse of process, then he must also plausibly allege that the lawsuit "is 'devoid of factual support or if supportable in fact, [has] no cognizable basis in law.'" *Sterenbuch*, 266 P.3d at 438-39 (modifications in the original) (quoting *Yadon*, 126 P.3d at 337) (additional citations omitted); *see also Dawson v. Cont'l Ins. Co.*, No. 13-cv-03511-PAB-KMT, 2015 WL 128158, at *3-4 (D. Colo. Jan. 8, 2015) (reasoning that the abuse of process claim was subject to dismissal to the extent it was premised on the defendant's act of filing suit and where the plaintiff failed to establish that the "defendant's claims have no cognizable basis in law") (citing and applying *Yadon*, 126 P.3d at 227). That he cannot do given this Court's already discussed recommendations that Plaintiff's claims for breach of contract, tortious interference, and Defend Trade Secrets Act violation remain.

Accordingly, the Court **recommends** that Plaintiff's Motion [#43] be **granted** to the extent that Defendant's Counterclaim Five (abuse of process) be **dismissed without prejudice**. *See Reynoldson*, 907 F.2d at 126.

### e.    Counterclaim Four (Declaratory Judgment)

Finally, Defendant asks the Court to issue four legal declarations of rights: (1) a determination that GSI has breached the CSA by failing to remit the Final Payment in a timely manner; (2) a determination that GSI has breached the CSA by failing to follow the mandatory ADR provisions; (3) a determination that Defendant Anderson has not violated the CSA, as evidenced by GSI's remittance of the Final Payment on September 5, 2023; and (4) a determination that GSI's entire lawsuit is frivolous, vexatious, and made for improper purposes. *Counterclaims* [#22] ¶ 169. Plaintiff argues that this claim is inappropriate because it is "duplicative of existing or invalid claims" and Defendant "seeks to use the declaratory judgment process to recast himself as the party seeking relief" and "to preempt the ordinary course of litigation procedures[.]" *See Pl.'s Motion* [#43] at 17-18 (citing *Mid-Continental Cas. Co. v. Vill. at Deer Creek Homeowners Ass'n, Inc.*, 685 F.3d 977, 980-81 (10th Cir. 2012) (examining the five factors set forth in *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994)).

In *State Farm Fire and Casualty Company v. Mhoon*, the Tenth Circuit reaffirmed that a "district court is not obliged to entertain every justiciable declaratory claim brought before it." 31 F.3d at 983. It directed courts to consider five factors when determining whether to hear a declaratory action:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race to *res judicata*'; [4]

whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

*Id.* (citation omitted).

Regarding the first *Mhoon* factor, Defendant's four requested legal determinations would not settle this controversy. In addition to the contract claims connected to these legal determinations, GSI has also alleged tort claims for interference with contract and misappropriation of trade secrets. *See Am. Compl.* [#19] ¶¶ 43-65. Determining the parties' rights under the CSA would not resolve those tort claims, and a determination that GSI's "entire lawsuit is frivolous, vexatious, and made for improper purposes" presupposes that Defendant has already prevailed on every claim, which he has not. Thus, the first factor weighs against hearing this declaratory action.

Regarding the second *Mhoon* factor, Defendant's declaratory action would not help to clarify the parties' legal relations because these issues are squarely before the Court on the parties' other causes of action. *See, e.g.*, *Peterson v. USAA Life Ins. Co.*, No. 17-cv-01514-CMA-KMT, 2017 WL 10619943, at *2-3 (D. Colo. Dec. 27, 2017) ("A court can dismiss a redundant counterclaim for declaratory judgment where the issues will be rendered moot by adjudication of the main action.") (citation and internal quotation marks omitted). The first and second issues are redundant of Defendant's own breach of contract counterclaim, which asserts (in part) that GSI breached the CSA by failing to timely remit the Final Payment and by failing to follow the ADR provisions. *See Counterclaims* [#22] ¶¶ 128, 134. The third issue is redundant of Plaintiff's breach of contract claim, which alleges that Defendant Anderson violated the CSA by hiring Mr. Williams. *See Am. Compl.* [#19] ¶ 40. Finally, the fourth issue is redundant of Defendant's

own abuse of process counterclaim, in which he alleges that Plaintiff brought this "sham lawsuit" for ulterior purpose. *See Counterclaims* [#22] ¶¶ 174, 177. Because these very same issues are squarely presented by the parties' other claims, a declaratory action would offer no additional clarity. The Court finds that the second factor weighs against hearing this declaratory action.

The Court finds that the third *Mhoon* factor is neutral. Defendant *may* be engaging in "procedural fencing" or a "race to *res judicata*" by stating substantive causes of action while simultaneously moving for a declaratory action—particularly given that Fed. R. Civ. P. 57 provides that the Court "may order a speedy hearing of a declaratory-judgment action." *See also Pl.'s Motion* [#43] at 18 (arguing that Defendant may be attempting "to preempt the ordinary course of litigation procedures through early motions practice"). However, aside from the applicability of the ADR provision (which is jurisdictional and, therefore, appropriately raised early), Defendant has not asked the Court for a speedy resolution or hearing of his declaratory action. *See Smith v. Aliera Cos., Inc.*, 534 F. Supp. 3d 1345, 1353 (D. Colo. 2021) ("A valid, enforceable arbitration clause divests a trial court of jurisdiction over all issues that must be submitted to arbitration[.]"). Based on the record before it, the Court cannot infer that Defendant has asserted these redundant claims with any improper or strategic motive. The third factor is, therefore, neutral.

Regarding the fourth *Mhoon* factor, there is no concurrent or pending state court case that could be impacted by Defendant's declaratory action. Defendant argues that this factor weighs against dismissal because "GSI has shoehorned in a slew of common law state court claims," but this is a non-sequitur. *Response* [#53] at 17. This Court must apply the same substantive state law to these contract issues whether they are resolved

through a declaratory action or through separate breach of contract claims. *See Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1164 (10th Cir. 2017) ("Federal courts sitting in diversity must apply state substantive law in order to discourage forum shopping and to avoid inequitable administration of the respective state and federal laws."). Defendant does not explain how doing so through ordinary litigation would cause more problems than doing so through declaratory action. The fourth factor is neutral.

Finally, under the fifth *Mhoon* factor, the most effective way to resolve these issues and determine the parties' respective legal rights is through ordinary litigation. Defendant argues for only one alternative, mediation, but the Court has found in Section III.A. above that the parties did not agree to mediate this case because it was filed after the Restricted Period expired. Mediation may well be a better and more effective alternative, and the parties are free to pursue it during litigation, but the Court cannot compel GSI to mediate under the CSA. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002) (stating that the FAA "does not require parties to arbitrate when they have not agreed to do so") (quotation omitted). Instead, ordinary litigation of these substantive claims is the most efficient way to resolve these issues. The Court finds that the fifth factor weighs against hearing Defendant's declaratory action.

Having weighed all five *Mhoon* factors, the Court **recommends** that Plaintiff's Motion [#43] be **granted** to the extent that Defendant's Claim Four for declaratory action be **dismissed without prejudice**. *See Reynoldson*, 907 F.2d at 126.

## IV. Conclusion

Based on the foregoing,

IT IS HEREBY **RECOMMENDED** that Defendant's Motion [#23] be **GRANTED in part** and **DENIED in part**. It is **recommended** that the Motion be **granted** to the extent that Plaintiff's Claim Three (Civil Conspiracy) be **DISMISSED with prejudice** and that Plaintiff's Claim Five (CUTSA) be **DISMISSED**, with leave to file an amended complaint that substitutes a KUTSA claim in place of the CUTSA claim. It is **recommended** that the Motion be otherwise **denied**.

IT IS FURTHER **RECOMMENDED** that Plaintiff's Motion [#43] be **GRANTED in part** and **DENIED in part**. It is **recommended** that the Motion be **granted** to the extent that Defendant's Counterclaims Two (Breach of Implied Duty of Good Faith and Fair Dealing), Three (Tortious Interference), Four (Declaratory Judgment), and Five (Abuse of Process) be **DISMISSED without prejudice**, that Defendant's Counterclaim One (Breach of Contract) be **DISMISSED in part with prejudice** with respect to GSI's alleged violation of the ADR provision, and that Defendant's Counterclaim One (Breach of Contract) be **DISMISSED in part without prejudice** as to (1) GSI's alleged violation of the non-disparagement clause; and (2) GSI's alleged failure to timely remit a Final Payment. It is **recommended** that the Motion be otherwise **denied**.[11]

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have **fourteen (14) days** after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this

---

[11] If this Recommendation is adopted in full, Plaintiff's remaining claims will be: Claim One (Breach of Contract), Two (Tortious Interference), and Four (Defend Trade Secrets Act). Defendant's only remaining counterclaim will be: Claim One (Breach of Contract) with respect to the late Initial Payment.

case is assigned. A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: February 25, 2025             BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge